1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JAMI LUCAS, et al.,                         No. 1:18-cv-01488-DAD-EPG

12                  Plaintiffs,

13          v.                                    ORDER GRANTING IN PART AND
                                                  DENYING IN PART DEFENDANTS'
14   COUNTY OF FRESNO and JARED                   MOTION TO DISMISS
     MULLIS,
15                                                (Doc. No. 11)
                    Defendants.
16

17

18          This matter is before the court on the motion to dismiss filed on behalf of defendants

19   County of Fresno ("Fresno County") and Jared Mullis.  (Doc. No. 11-1.)  On April 16, 2019, the

20   motion came before the court for hearing.  Attorney Khaldoun A. Baghdadi appeared on behalf of

21   plaintiffs Jami Lucas; Oscar Gonzalez; Ashley Lucas; Gianna Lucas; E.L., a minor, by and

22   through his *guardian ad litem*, Jami Lucas; and the Estate of Rodney Lucas, by and through its

23   representative, Jami Lucas.  Attorney Michael J. Haddad appeared on behalf of plaintiffs John

24   Lucas and Ruth Arieas.  Attorneys James Weakley and Brande L. Gustafson appeared on behalf

25   of defendants.  Having reviewed the parties' submissions and heard from counsel, defendants'

26   motion will be granted in part and denied in part.

27   /////

28   /////

                                                 1

**PROCEDURAL BACKGROUND**

This action proceeds on the first amended complaint ("FAC") filed on December 11, 2018. (Doc. No. 9.) Plaintiffs allege violations of substantive due process rights, loss of familial association, and a *Monell* claim against Fresno County. Defendants moved to dismiss on December 24, 2018. (Doc. No. 11-1.) Plaintiffs filed an opposition to the motion to dismiss on April 2, 2019. (Doc. No. 23.) Defendants Jared Mullis and Fresno County filed separate replies on April 9, 2019. (Doc. Nos. 24–25.)

**FACTUAL BACKGROUND**

In their FAC, plaintiffs allege as follows. Sergeant Rod Lucas (the "decedent") was accidentally shot and killed by defendant Deputy Jared Mullis[1] on October 31, 2016. (FAC at ¶ 11.) At the time of the incident, both were on-duty in the narcotics room at the offices of the Fresno County Sherriff ("FCS"); two other law enforcement officers, Special Agent John Tilley and Deputy Carl McSwain, were nearby and looking on. (*Id.* at ¶ 15.) While in the narcotics room, the decedent and Deputy Mullis began to play-fight using Mixed Martial Arts moves on each other. During the playfight, the decedent's backup pistol fell out of its holster and onto the ground, at which point he retrieved and re-holstered his weapon. (*Id.* at ¶ 13.)

Deputy Mullis, a certified armorer with the FCS, then went to his desk and retrieved his backup weapon, a Smith & Wesson M&P®45 SHIELD™ pistol inside a plastic Kydex holster. (*Id.* at ¶ 2, 14.) The weapon was fully loaded, with a chambered bullet, and lacked an external thumb safety. (*Id.* at ¶ 14.) Deputy Mullis returned to the narcotics room to show the decedent his pistol as part of a "serious conversation about safety concerns" related to the decedent's "ill-fitting holster" and to "educate Sgt. Lucas by demonstrating how effective his personal holster was in retaining his service weapon compared to the department-issued holster." (Doc. No. 23 at 13.) As part of his demonstration, Deputy Mullis held his pistol out in front of him with the barrel pointed at the decedent. (FAC at ¶ 16.) As Deputy Mullis returned his pistol to his holster,

---

[1] Plaintiff's FAC describes defendant Deputy Mullis as a detective and certified armorer with the Fresno County Sheriff's Office. (Doc. No. 9 at 2.) It appears to be a common and approved practice for officers of that office to utilize different backup or undercover weapons and holsters while acting in an undercover capacity. (*Id.* at 12.)

1  he shot the decedent in the chest.  (*Id.* at ¶ 19.)  Although first aid was administered, the decedent

2  succumbed to his injuries approximately thirty minutes later, at 4:11 p.m.  (*Id.* at ¶ 20.)

### LEGAL STANDARD

The purpose of a Rule 12(b)(6) motion to dismiss is to test the legal sufficiency of the complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989).  However, the court need not assume the truth of legal conclusions cast in the form of factual allegations.  *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986).  While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678.  A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 676 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Moreover, it is inappropriate to assume that the plaintiff "can prove facts which it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged."  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

### DISCUSSION

Plaintiffs allege two causes of action:  1) violations of 42 U.S.C. § 1983 based upon a Fourteenth Amendment substantive due process violation by defendant Deputy Mullis, leading to

3

the loss of First and Fourteenth Amendment rights to familial relationships; and 2) a violation of 42 U.S.C. § 1983 by Fresno County on the basis of *Monell* liability.  (Doc. No. 9 at 15–21.)

**A.      Familial Association**

In their first cause of action, plaintiffs allege that they were deprived of the "constitutional right to familial relationships, companionship, society, and support of one another, as secured by the First and Fourteenth Amendments."  (Doc. No. 9 at 15.)  Defendants move for dismissal of this claim to the extent it is based on the First Amendment, arguing that plaintiffs' claims for the deprivation of familial relationships are duplicative of and are more precisely and properly pled under the Fourteenth Amendment.  (Doc. No. 11-1 at 5–6.)

Courts, however, are not to dismiss a statement of a claim simply because it is offered in the alternative of another claim.  *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.").  Moreover, the Ninth Circuit has concluded that a claim for the deprivation of the right to a familial relationship may be simultaneously asserted under both the First and Fourteenth Amendments.  *See Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018) (holding that "claims under both the First and Fourteenth Amendment for unwarranted interference with the right to familial association could survive a motion to dismiss"); *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (holding that plaintiffs adequately alleged violations of the First and Fourteenth Amendments based on a mother and son's right to familial association), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

Defendants also argue that plaintiffs fail to allege sufficient associational interests to bring a claim for deprivation of familial relationship under the First Amendment.  (Doc. No. 11-1 at 5.) However, "the First Amendment protects those relationships, including family relationships, that presuppose 'deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life.'"  *Lee*, 250 F.3d at 685 (9th Cir. 2001) (quoting *Board of Dir. v. Rotary Club*, 481 U.S. 537, 545 (1987); *see also Mann v. City of Sacramento*, 748 F. App'x 112, 115 (9th Cir. 2018) (concluding that the right of intimate association is analyzed "in

4

the same manner regardless whether we characterize it under the First or Fourteenth Amendments").[2]

As the decedent's wife, children, and parents, plaintiffs have adequately plead their associational interests sufficient to withstand a motion to dismiss.  (Doc. Nos. 11-1 at 5–6; 25 at 2); *see, e.g.*, *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1169 (9th Cir. 2013) ("[I]n past cases, we have recognized a parent's right to a child's companionship without regard to the child's age.") (collecting cases); *Estate of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162, 1176 (E.D. Cal. 2019) ("As the wife and son of the decedent, [plaintiffs] possess constitutionally protected liberty interests in the companionship and society of their husband and father, respectively."); *Morales v. City of Delano*, 852 F. Supp. 2d 1253, 1273–74 (E.D. Cal. 2012) (finding that spouses and children possess a constitutional interest in familial companionship with their spouse and parents).

Therefore, defendants' motion to dismiss plaintiff's First and Fourteenth Amendment claims due to duplication and failure to plead sufficient associational interests will be denied.

**B.      Whether Deputy Mullis Was Acting Under Color of State Law**

Defendants argue that plaintiffs have failed to allege sufficient facts demonstrating that Deputy Mullis was acting under the color of state law when he allegedly shot the decedent and that the § 1983 claim against him must therefore be dismissed.  (Doc. No. 11-1 at 6–7); *see* 42 U.S.C. § 1983 (providing that "[e]very person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress").

1.      The Relevant Test

According to defendants, the three-pronged test established in *Anderson v. Warner* should be applied in determining whether Deputy Mullis was acting under the color of state law:

/////

_____

[2]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

First, the defendant's action must have been performed while the officer is acting, purporting, or pretending to act in the performance of his or her official duties. Second, the officer's pretense of acting in the performance of his duties must have had the purpose and effect of influencing the behavior of others. Third, the challenged conduct must be related in some meaningful way either to the officer's governmental status or to the performance of his duties.

451 F.3d 1063, 1068–69 (9th Cir. 2006) (internal quotation marks and citations omitted).

Defendants contend that, under the *Anderson* test, Mullis was not acting under color of state law because he was not attempting to influence the decedent and was not exercising his responsibilities pursuant to state law. (Doc. No. 11-1 at 7.)

However, this three-part test was employed in *Anderson* only to determine whether an *off-duty* employee was acting under color of state law. *See Anderson*, 451 F.3d at 1068–69 ("In the circumstances of **this** case," which involved an off-duty police officer assaulting a motorist who had rear-ended the officer's personal vehicle, "there are three critical requirements that must be satisfied" (emphasis added)). The Ninth Circuit has thereafter recognized that the test to be applied in determining whether an officer is acting under color of state law is a different one when the officer is on duty.

> Under [*Stanewich*, *McDade*, *and Anderson*], **a state employee who is on duty,** or otherwise exercises his official responsibilities in an off-duty encounter**, typically acts under color of state law.** That is true even if the employee's offensive actions were illegal or unauthorized. **A state employee who is off duty nevertheless acts under color of state law when (1) the employee "purport[s] to or pretend[s] to act under color of law," (2) his "pretense of acting in the performance of his duties . . . had the purpose and effect of influencing the behavior of others," and (3) the harm inflicted on plaintiff "'related in some meaningful way either to the officer's governmental status or to the performance of his duties.'"** On the other hand, a government employee does not act under color of state law when he pursues private goals via private actions.

*Naffe v. Frey*, 789 F.3d 1030, 1037 (9th Cir. 2015) (emphasis added and omitted) (citations omitted) (applying the *Anderson* test in a case where the defendant, a county employee, was blogging off-duty in his personal capacity).

Because defendant Deputy Mullis was on-duty at the time of the incident that lies at the heart of this lawsuit, the *Anderson* test does not strictly govern the determination of whether he

6

was acting under the color of state law.  The court, mindful that there is no "rigid formula" for determining whether an official is acting under color of state law, instead looks holistically at "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." *Anderson*, 451 F.3d at 1068 (internal citations omitted) (citing *Ouzts v. Md. Nat'l Ins. Co.*, 505 F.2d 547, 550 (9th Cir. 1974) and *Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995)).

For example, the Ninth Circuit has held:

> A person acts under color of state law[] if he exercise[s] power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.  It is firmly established that a defendant in a § 1983 suit acts under color of state law *when he abuses the position given to him by the state.* Thus generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law."

*Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 479 (9th Cir. 1991) (internal quotations and citations omitted) (concluding that a refugee counselor acted under color of state law when he raped refugees under the guise of helping them obtain employment); *see also Naffe*, 789 F.3d at 1036 (noting that a state employee is acting under color of state law when he "wrongs someone 'while acting in his official capacity or while exercising his responsibilities pursuant to state law'") (citing *West v. Atkins*, 487 U.S. 42, 50 (1988)).

    2.   Under the Facts Alleged, Mullis's Actions Were Committed While Acting Under Color of State Law

Plaintiffs allege that Deputy Mullis's actions were performed while he was on-duty in the FCS's office and in the course of demonstrating to the decedent proper gun safety practices, a responsibility consistent with his position as a certified armorer.  (FAC at ¶ 2, 11.)

Defendants counter, arguing that the incident "could have just as easily occurred between private citizens comparing holsters on their concealed carry weapons at a range and does not amount to the additional indicia of state authority necessary to conclude that Deputy Mullis's conduct was under color of law."  (Doc. No. 11-1 at 7.)  In support of this contention, defendants rely on a decision of the First Circuit where a police officer accidentally shot another officer

while "horsing around." *Martinez v. Colon*, 54 F.3d 980, 987 & n.5 (1st Cir. 1995). There, the First Circuit concluded that it was not

> reasonable to hold that *every* use of a policeman's gun, even in the course of purely personal pursuits, creates a cause of action under section 1983. Instead, we are of the view that the context in which a service revolver is used, not just the mere fact of its use, must be consulted to determine the constitutional relevance of the officer's conduct.

*Martinez*, 54 F.3d at 987–88.

It is the case that an individual does not act under color of state law merely because he is a police officer. *See Gritchen v. Collier*, 254 F.3d 807, 812 (9th Cir. 2001) ("Just because Collier is a police officer does not mean that everything he does is state action."); *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 838 (9th Cir. 1996) ("The district court was not required to find that Stanewich acted under color of state law merely because he was a law enforcement officer.").

However, in resolving the pending motion to dismiss, consideration of several allegations of the FAC persuade the court that plaintiff has adequately pled that defendant Deputy Mullis was acting under color of state law at the relevant time. First, defendant Deputy Mullis was on duty, apparently in uniform, inside the FCSO narcotics room at the time of the incident with his fellow officers and was permitted, due to his position, to be in possession of and to handle a loaded firearm. *See Martinez*, 54 F.3d at 992 (Bownes, J., dissenting). Moreover, defendant Deputy Mullis shot the decedent, not while involved in "purely personal pursuits," but allegedly while trying to show the decedent how to safely secure a pistol in a holster. (*See* FAC at 4–5, ¶ 13-16; *see also* Doc. No. 23 at 13.) Ensuring the proper maintenance, storage, and operation of firearms would seem to clearly be responsibilities that lay squarely in the ambit of any police officer, let alone the armorer of a Sheriff's Department. Characterizing such activities as a "purely personal pursuit" would not be accurate or reasonable. Thus, in the undersigned's view, plaintiff's allegations provide an adequate basis upon which to claim that defendant Deputy Mullis' actions were related to the performance of his official duties. *See Van Ort v. Estate of Stanewich*, 92 F.3d

/////

/////

831, 838 (9th Cir. 1996).[3]

For these reasons, the court concludes that plaintiffs have alleged facts that, if proven true, would show that defendant Deputy Mullis' actions were taken under the color of state law.

## C.    Deliberate Indifference Under the Fourteenth Amendment

Plaintiffs have asserted a Fourteenth Amendment substantive due process claim, brought under 42 U.S.C. § 1983, for the deprivation of their constitutional right to familial relationships. (Doc. No. 9 at 15–16.)  In moving to dismiss that claim, defendants argue that plaintiffs have failed to allege sufficient facts to support a cognizable claim for deliberate indifference under the Fourteenth Amendment.  (Doc. No. 11-1 at 8–9.)

In the seminal case *County of Sacramento v. Lewis*, the Supreme Court noted that the Fourteenth Amendment's due process clause contains both procedural and substantive limits on government actions, the "touchstone" of which is "protection of the individual against arbitrary action of government."  523 U.S. 833, 845–46 (1998) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)).  "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense;'" thus, government action must "shock[] the conscience" in order to be actionable as a substantive due process claim. *Id.* at 846–47 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 129 (1992)).  As the Ninth Circuit has recently explained:

> To prevail on a substantive due process claim under the Fourteenth Amendment, Plaintiffs must show that an officer's conduct "shocks the conscience." *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). The "critical consideration [is] whether the circumstances are such that actual deliberation is practical." *Porter v. Osborn*, 546

---

[3]  It is true that the First Circuit in *Martinez* suggested that "police-on-police" incidents such as this one are less likely to involve actions taken under color of state law. *See Martinez*, 54 F.3d at 988 ("[W]hen the victim is himself a fellow officer and the particular interaction between the two officers is of a distinctively personal nature, it can generally be assumed that the aggressor's official trappings, without more, will not lead the victim to believe that the aggressor is acting with the imprimatur of the state and, in turn, to forgo exercising his legal rights."); *cf. Martinez*, 54 F.3d at 992 (Bownes, J., dissenting) (explaining that the plaintiff "could well have believed" that the "hazing of young officers was standard fare" in the precinct and that the government acquiesced to the defendants' actions when "bystander officers (including [a supervisor]) failed to intervene during the initial rounds of abuse").  The assumption made by the majority in *Martinez* does not apply here.  Rather, it can be inferred from the allegations of plaintiffs' complaint that the decedent could have been influenced by Deputy Mullis's authority and expertise as a certified police armorer when Mullis tried to demonstrate to decedent how a firearm is properly secured.

9

F.3d 1131, 1137 (9th Cir. 2008) (quoting *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998)). If so, "an officer's 'deliberate indifference' may suffice to shock the conscience," *Wilkinson*, 610 F.3d at 554, and the plaintiff may prevail by showing that the officer "disregarded a known or obvious consequence of his action," *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011). The "deliberate-indifference inquiry should go to the jury if any rational factfinder could find this requisite mental state." *Id.*

*Nicholson v. City of Los Angeles*, 935 F.3d 685, 692 (9th Cir. 2019).[4]

Of course, what "shocks the conscience" may differ from situation to situation. *Lewis*, 523 U.S. at 850 ("Rules of due process are not . . . subject to mechanical application in unfamiliar territory."). In this case, the parties agree that the deliberate indifference standard applies. Actions done with "deliberate indifference" are normally sufficiently egregious to offend due process, though this standard "is sensibly employed only when actual deliberation is practical." *See, e.g.*, *id.* at 851 ("[I]n the custodial situation of a prison, forethought about an inmate's welfare is [generally] not only feasible but obligatory[.]"); *S.R. Nehad v. Browder*, 929 F.3d 1125, 1139 (9th Cir. 2019) ("Police action sufficiently shocks the conscience, and therefore violates substantive due process, if it is taken with . . . deliberate indifference . . . unrelated to legitimate law enforcement objectives.") (quoting *A.D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013)); *Cox v. Department of Social and Health Services*, 913 F.3d 831, 837 (9th Cir. 2019) ("Conduct that 'shocks the conscience' is deliberate indifference to a known or so obvious as to imply knowledge of, danger.") (quoting *Tamas v. Washington Dep't of Soc. & Health Servs.*, 630 F.3d 833, 844 (9th Cir. 2010)).

To review, plaintiffs allege in their FAC the following. Defendant Deputy Mullis was a certified armorer with the FCS. (FAC at ¶ 2.) Deputy Mullis knew that pointing a loaded pistol at Sgt. Lucas would pose a serious risk of harm and disregarded that obvious risk of harm in a substantial departure from professional judgment and standards. (*Id.* at ¶ 16.) Mullis did not

---

[4] The "shocks the conscience" standard applies here because the incident in question clearly involved a circumstance where Deputy Mullis had time to engage in actual deliberation rather than a circumstance where he was called upon to make a snap judgment in response to a rapidly escalating situation. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *see also Estate of Osuna v. County of Stanislaus*, 392 F. Supp. 3d 1162, 1176 (E.D. Cal. 2019).

unload the pistol, drop the magazine, nor take the round out of the chamber. (*Id.*) Rather, he

pointed his pistol at Sgt. Lucas' chest without any legitimate law enforcement purpose. (*Id.* at ¶

17.) Because he acted arbitrarily and his actions lacked any relationship to promoting public or

individual health, safety, and welfare, his decision to point the loaded pistol at Sgt. Lucas was

therefore conscience-shocking. (*Id.*) Moreover, Mullis had the luxury of time to make an

unhurried judgment when he ignored FCS's official gun safety rules and instead adhered to an

unconstitutional gun handling custom by refusing to unload his pistol, drop the magazine, or

remove the chambered round. (*Id.* at ¶¶ 18, 30.) Mullis' conduct created an unnecessary and

high risk of death or serious injury to Sgt. Lucas. (*Id.* at ¶ 41) According to plaintiffs, if these

facts are proven to be true, defendant Mullis deprived Sgt. Lucas of his constitutional right to life

and liberty and deprived plaintiffs of their right to familial relationships under the First and

Fourteenth Amendments. (*Id.* at ¶¶ 16, 38.)

In this context, the undersigned finds plaintiffs' allegations sufficient to both support a

cognizable claim for deliberate indifference under the Fourteenth Amendment and to survive a

motion to dismiss. *See Roberts v. Bell*, 281 F. Supp. 3d 1074, 1080–81 (D. Mont. 2018) (denying

a motion to dismiss a Fourteenth Amendment substantive due process claim because the question

of whether the defendant's alleged conduct in that case shocked the conscience under the

deliberate indifference standard was appropriately determined by a jury); *see also Deloney v.

County of Fresno*, 1:17-cv-01336-LJO-EPG, 2019 WL 1875588, at * 7 (E.D. Cal. Apr. 26, 2019)

(denying a motion to dismiss a substantive due process claim because "[plaintiffs have]

sufficiently alleged a plausible deliberate indifference claim" against defendants who allegedly

failed to take "any additional steps besides placing [the decedent] in safety housing after allegedly

knowing [he] had reported hearing voices in his head to kill himself"); *Miller v. Rupf*, No. C 07-

01137 VRW, 2007 WL 9735007, at *11 (N.D. Cal. Aug. 20, 2007) (concluding, under the

circumstances alleged, that plaintiffs had pled a reckless or deliberate indifference claim

sufficient to survive a motion to dismiss). Accordingly, defendants' motion to dismiss the claim

for deliberate indifference in violation of the Fourteenth Amendment will be denied.

/////

**D.** *Monell* **Claims**

Defendants also argue that plaintiffs have failed to allege sufficient facts to state a cognizable *Monell* claim against Fresno County. (Doc. No. 11-1 at 9–11.) Plaintiffs advance their *Monell* claims against the county on four bases: 1) unsafe firearm handling customs; 2) a lack of policies for approving holsters for backup firearms and a failure to train; 3) a custom of covering up constitutional violations and promoting a code of silence; and 4) ratification of the alleged unconstitutional conduct by defendant Deputy Mullis. (Doc. No. 23 at 17–23.)

It is well-established that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 692 (1978); *see also Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).

To state a *Monell* claim against defendant Fresno County, plaintiff must allege facts demonstrating "that an 'official policy, custom, or pattern' on the part of [Fresno County] was 'the actionable cause of the claimed injury.'" *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (quoting *Harper v. City of Los Angeles*, 533 F.3d 1010, 1022 (9th Cir. 2008)). A *Monell* claim can be established in one of three ways.

First, a local government may be held liable for "an expressly adopted official policy." *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004).

Second, a public entity may be held liable for a "longstanding practice or custom." *Thomas v. Cty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014). Such circumstances may arise when, for instance, the public entity "fail[s] to implement procedural safeguards to prevent constitutional violations" or when it fails to adequately train its employees. *Tsao*, 698 F.3d at 1143 (citing *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992)); *see Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."); *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (requiring a plaintiff asserting a claim based on a failure to train to allege facts showing that defendants "disregarded the known or obvious consequence that a particular omission in their training program would cause municipal employees to violate citizens'

constitutional rights") (internal brackets omitted) (quoting *Connick*, 563 U.S. at 61)).

"Third, a local government may be held liable under § 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Clouthier v. Cty. of Santa Clara*, 591 F.3d 1232, 1250 (9th Cir. 2010) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc).

### 1. Unsafe Firearm Handling Custom

First, plaintiffs contend that Fresno County "has a policy of deliberate indifference to a pattern and practice of unsafe gun handling by its . . . personnel that is manifested in its failure to discipline or retrain officers involved in such incidents." (Doc. No. 23 at 13.) Defendants argue that two incidents[5] are insufficient to establish a pattern of violations in this regard. (Doc. No. 25 at 5–6.)

"Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *holding modified on other grounds by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001); *see also Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999) ("A single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom."); *Cain v. City of Sacramento*, No. 2:17-cv-00848-JAM-DB, 2017 WL 4410116, at *3 (E.D. Cal. Oct. 4, 2017) (dismissing the plaintiff's *Monell* claim because it alleged only a single encounter between plaintiff and jail staff).

Although "[i]t is difficult to discern from the caselaw the quantum of allegations needed to survive a motion to dismiss a pattern and practice claim," *Gonzalez v. County of Merced*, No. 1:16-cv-01682-LJO-SAB, 2017 WL 6049179, at *2 (E.D. Cal. Dec. 7, 2017), "where more than a few incidents are alleged, the determination appears to require a fully-developed factual record."

---

[5] Plaintiffs allege that four days after the death of the decedent, another FCS officer shot himself in the leg with his .45 caliber Smith & Wesson pistol. (FAC at ¶ 30.)

*Lemus v. County of Merced*, No. 1:15-cv-00359-MCE-EPG, 2016 WL 2930523, at *4 (E.D. Cal. May 19, 2016), *aff'd*, 711 Fed. App'x 859 (9th Cir. 2017); *see also Becker v. Sherman*, No. 1:16-cv-0828-AWI-MJS (PC), 2017 WL 6316836, at *9 (E.D. Cal. Dec. 11, 2017) (finding that "four assaults related to [plaintiff's] housing assignment and status as a transgender inmate . . . sufficiently alleged the existence of a CDCR custom"), *findings and recommendations adopted*, 2018 WL 623617 (E.D. Cal. Jan. 30, 2018).

In support of their theory for *Monell* liability, plaintiffs point out that:

> FCS's SID personnel maintained a widespread practice permitting officers to handle loaded firearms carelessly and point them in the direction of others (FAC at ¶¶ 1, 27, 47a);
>
> FCS expected SID personnel to follow the three firearm safety principles to prevent injuries and deaths (*Id.* at ¶ 25);
>
> At least five SID personnel acknowledged they were expected to follow the firearm safety principles (*Id.* at ¶ 26);
>
> At least three SID personnel acknowledged they did not follow the firearm safety principles and that they observed others in the SID casually pass loaded firearms around (*Id.* at ¶ 28);
>
> The de facto firearm handling custom effectively replaced FCS's firearm safety principles (*Id.* at ¶ 27);
>
> FCS and its policy-makers and managing agents should have known of the unconstitutional custom given the proper exercise of their official duties (*Id.*);
>
> Defendant Mullis ignored FCS's firearm safety principles and adhered to the unconstitutional custom (*Id.* at ¶ 29);
>
> Mullis refused to unload his weapon, drop the magazine, and dislodge the round from the chamber in continuance of said custom (*Id.*);
>
> Said custom created a substantial and serious risk to Sgt. Lucas' constitutional right to live (*Id.*); and
>
> Plaintiffs were deprived of their constitutional rights as a direct and proximate result of the unconstitutional custom.

(Doc. No. 23 at 18–19.)

In addition, FCS officers have testified that "[e]veryone in the office" passed loaded guns without safeties around "all the time," "more often than any other office," and that such practices

14

are "not unusual at all," even though official FCS policy is for officers to render a firearm safe before handling.  (FAC at ¶ 25, 28.)  These allegations suggest that, despite these clear violations of "official" FCS policy, officers continued to disregard FCS's gun handling policies and effectively supplanted them with a custom of unsafe gun handling that lead to the predictable consequence of a firearm accident.

Accepting these allegations as true and in the light most favorable to plaintiffs, the court concludes that plaintiffs have sufficiently alleged a custom of unsafe gun handling at FCS and that such a custom is sufficient to form the basis of a claim for liability under *Monell*.  *See Monell*, 436 U.S. at 690–91 ("[L]ocal governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels[.]"); *see also Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992) (holding that there "is also no question that the decision not to take any action" to alleviate the problem of missed arraignments, which is contrary to state law, "constitutes a policy for purposes of § 1983 municipal liability."); *Berry v. Baca*, 379 F.3d 764, 769 (9th Cir. 2004) (holding that, in a case regarding the release of prisoners after judicial determinations of innocence, the county's implementation of policies that led to delays in release—and the lack of policies to expedite the process—could support a § 1983 claim).

Defendants' motion to dismiss plaintiffs' *Monell* claim will therefore be denied as to the alleged custom of unsafe gun handling.

**2. Lack of Policy for Approving Backup Firearms and Holsters and a Failure to Train**

Plaintiffs also allege that Fresno County does not have a policy for approving holsters for backup firearms and fails to train its officers on properly using their equipment.  (Doc. No. 23 at 19–20.)

Ordinarily, plaintiffs must allege a "pattern of similar constitutional violations by untrained employees" in order to state a claim for deliberate indifference based upon a failure to train.  *Flores*, 758 F.3d at 1159 (quoting *Connick*, 563 U.S. at 62).  Here, plaintiffs do not sufficiently allege a pattern of similar constitutional violations regarding the County's use of

15

backup firearms. Even if plaintiffs could amend their complaint with additional details about the second incident of mishandling a gun, courts have generally found that two examples of misconduct are insufficient to establish a "pattern of similar constitutional violations." *See Flores*, 758 F.3d at 1159 ("The isolated incidents of criminal wrongdoing by one deputy other than Deputy Doe 1 do not suffice to put the County . . . on notice that a course of training is deficient in a particular respect, nor that the absence of such a course "will cause violations of constitutional rights." (internal quotations omitted)).

Neither can the court conclude from the allegations of the complaint that this is a circumstance in which "the unconstitutional consequences of failing to train could be so patently obvious that [a defendant] could be liable under § 1983 without proof of a pre-existing pattern of violations."[6] *Connick*, 563 U.S. at 64 (citing *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989)). In *Harris*, the Supreme Court postulated that a failure to train police officers on the constitutional limits of excessive force prior to arming them satisfied the narrow range of single-incident liability, because "[t]here is no reason to assume that police academy applicants are familiar with the constitutional constraints of the use of deadly force." 489 U.S. at 389–90. In *Flores*, the Ninth Circuit posited that "[t]here is, however, every reason to assume that police academy applicants are familiar with the criminal prohibition on sexual assault, as everyone is /// presumed to know the law." 758 F.3d at 1160 (citing *United States v. Budd*, 144 U.S. 154, 163 (1892)).

Here, plaintiffs' conclusory allegation that "FCS failed to institute and require proper training regarding an obvious need that ignore the highly predictable likelihood of deadly consequences" is insufficient to support a cognizable *Monell* claim based upon an alleged failure to train. Accordingly, defendants' motion to dismiss plaintiffs' *Monell* claim will be granted with leave to amend to the extent it is based on an alleged failure to train.

/////

/////

---

[6] The court notes that plaintiffs have alleged that FCS officers *were* trained to properly handle firearms and be aware of firearm safety principles. (FAC at ¶ 25–28; Doc. No. 23 at 18–19.)

### 3. Custom of Covering up Constitutional Violations and Promoting a Code of Silence

Plaintiffs also allege that FCS has covered up "violations of constitutional rights by failing to properly investigate . . . unconstitutional or unlawful police activity, and by allowing, tolerating, and/or encouraging police officers to make false statements; and by allowing, tolerating, and/or encouraging a 'code of silence.'" (FAC at ¶ 47.)

In support of this theory of *Monell* liability, plaintiffs allege:

> FCS improperly investigated the shooting death of Sgt. Lucas (FAC at ¶¶ 31–35, 47d);

> FCS never performed a gunshot residue kit on Defendant Mullis' person or his clothing (Id. at ¶ 30);

> FCS waited to collect a gunshot residue kit from the narcotics room until after a cleaning crew cleaned the crime scene (Id. at ¶ 30);

> FCS never reprimanded Mullis for offering false testimony in three wildly contradictory statements (Id. at ¶ 31);[7]

> FCS never reprimanded Mullis for illegally tampering with the only eyewitness to the incident (Special Agent Tilley) (Id. at ¶¶ 33–34);[8]

---

[7] According to plaintiffs, Deputy Mullis attempted to conceal what happened on the day the decedent was shot:

> He, at one point, denied that there had been any horseplay or play fighting. He, at one point, falsely stated he had been sitting at his desk working. He, at one point, falsely stated that Sergeant Lucas' gun had fallen during a stretching motion. He, at one point, falsely stated that he handed his holstered gun to Lucas. He, at one point, falsely stated that Sergeant Lucas shot himself with the gun while holding it. He gave at least three separate statements, all of which contradicted one another about the key facts.

(FAC at ¶ 32.)

[8] Plaintiffs also allege that Special Agent Tilley twice offered accurate eyewitness testimony of the incident: on October 31, 2016, at an interview after the incident, and on November 2, 2016, at a videotaped walkthrough interview. It is alleged that at both interviews, Special Agent Tilley stated that he had a clear vantage point and watched Deputy Mullis shoot the decedent. FCS then held a debrief meeting later on November 2, 2016, that included both Deputy Mullis and Special Agent Tilley. There:

> Defendant Deputy Mullis denied shooting Sergeant Lucas and demanded Special Agent Tilley recant his position regarding his own recollection of events. The following morning, November 3,

17

FCS held the debrief meeting at which Mullis induced Special Agent Tilley to change his testimony (*Id.* at ¶ 34);

FCS's "code of silence" reflects their consciousness of guilt and liability (*Id.* at ¶ 35);

FCS's "code of silence" [policy] precluded proper investigation and discipline of Mullis with deliberate indifference to Plaintiffs' rights (*Id.* at ¶ 49).

These allegations paint a pattern of repeated behavior involving multiple officers that is sufficient to support a theory that FCS sanctions a code of silence and a culture of encouraging the covering up of officer misconduct. *See, e.g.*, *Johnson v. Shasta Cty.*, 83 F. Supp. 3d 918, 931 (E.D. Cal. 2015) (concluding that plaintiffs stated a cognizable *Monell* claim when they alleged a custom of, among other things, covering up violations of constitutional rights and allowing, tolerating, and/or encouraging a code of silence); *Doe v. City of San Diego*, 35 F. Supp. 3d 1233, 1239–40 (S.D. Cal. 2014) (finding that "SDPD's failures to report misconduct, appropriately discipline misbehaving officers, and *de facto* policy where officers cover up, interfere with, and impede misconduct investigations" can support a § 1983 claim based on a code of silence).[9]

Therefore, defendants' motion to dismiss plaintiffs' *Monell* claim will be denied to the extent that claim is based upon an alleged FCS custom of covering up constitutional violations and promoting a code of silence among its deputies.

/////

---

Special Agent Tilley sent an email to Detective Donna Davis, stating that he had looked away before the gun was fired, and that he had not in fact seen the shooting. He later claimed that he had looked away at the moment of the shooting in order to text his wife, but that he no longer has the text because he deleted it.

(FAC at ¶ 34.)

[9] The serious nature of such allegations has been recognized by the Ninth Circuit. *See Dahlia v. Rodriguez*, 735 F.3d 1060, 1082–83 (9th Cir. 2013) ("The public's trust is diminished when a law enforcement officer abides by the code of silence to cover up misconduct engaged in by fellow officers. To strengthen the public's confidence in the integrity of its law enforcement officers, it is essential that an officer be encouraged or required to report misconduct committed by fellow officers."); *see also Blair v. City of Pomona*, 223 F.3d 1074, 1081 (9th Cir. 2000) (taking judicial notice of the existence of a police code of silence and noting "the seriousness of such a custom and the need of a civil rights remedy").

### 4. Ratification of Defendant Mullis' Alleged Unconstitutional Conduct

Plaintiffs base another theory of *Monell* liability upon allegations that Fresno County ratified the actions and omissions of defendant Deputy Mullis. (Doc. No. 9 at 18.) These allegations, however, are threadbare. Plaintiffs allege merely that:

> The unconstitutional actions and/or omissions of Defendant Deputy Mullis, as described above, were approved, tolerated and/or ratified by policy making officers for the Fresno County Sheriff's Department. Plaintiffs are informed and believe, and thereupon allege, the details of this incident have been revealed to the authorized policy makers within the Fresno County Sheriff's Office, and that such policy makers have direct knowledge of the fact that the shooting of Sergeant Lucas was not justified, but rather represented an unconstitutional violation of the fundamental right to life, with deliberate indifference to that right. Notwithstanding this knowledge, the authorized policy makers within the Fresno County Sheriff's Office have made a deliberate choice to endorse Defendant Deputy Mullis' shooting of Sergeant Lucas, and to participate in a code of silence to cover up its and Deputy Mullis' violations of constitutional rights and generally accepted law enforcement standards and to try to forestall their civil and/or criminal liability.

*Id.*

"[A] local government may be held liable under § 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Clouthier*, 591 F.3d 1232, 1250 (9th Cir. 2010), *overruled on other grounds by Castro*, 833 F.3d 1060 (citing *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)). However, a policymaker's "knowledge of an unconstitutional act does not, by itself, constitute ratification." *Weisbuch v. Cty. of Los Angeles*, 119 F.3d 778, 781 (9th Cir. 1997). Also, "a policymaker's mere refusal to overrule a subordinate's completed act does not constitute approval." *Iopa*, 176 F.3d at 1239. Rather, "[t]he policymaker must have knowledge of the constitutional violation and must make a 'conscious, affirmative choice' to ratify the conduct at issue." *Garcia v. City of Imperial*, No. 08CV2357 BTM(PCL), 2010 WL 3911457, at *1 (S.D. Cal. Oct. 4, 2010) (citing *Lytle*, 382 F.3d at 987). For example, the required ratification can be shown by a superior officer's decision to exculpate alleged misconduct based on the findings of a noticeably flawed investigation. *Larez v. City of Los Angeles*, 946 F.2d 630, 647 (9th Cir. 1991).

Here, plaintiff's complaint provides nothing more than conclusory allegations that the Fresno County Sheriff's Department ratified the unconstitutional conduct of their subordinates, which is insufficient to state a cognizable *Monell* claim. Accordingly, this aspect of plaintiffs' *Monell* claim will be dismissed.

### E.    Declaratory and Injunctive

Defendants assert that plaintiffs' requests for declaratory relief should be stricken because there is no current case or controversy before the court that warrants such relief, and plaintiffs lack Article III standing to seek injunctive relief. (Doc. No. 11-1 at 12.)

However:

> It is premature at the pleading stage to eliminate a potential remedy should plaintiffs prevail in this litigation. *See Howard v. City of Vallejo*, No. 13–1439, 2013 WL 6070494, at *7 (E.D. Cal. Nov. 13, 2013) ("plaintiffs' claim for injunctive relief must be resolved on an evidentiary record and not at the pleading stage" (citing *City of L.A. v. Lyons*, 461 U.S. 95, 103, 105, 111 (1983); *Hodgers–Durgin v. de la Vina*, 199 F.3d 1037, 1040–41 (9th Cir. 1999); and *LaDuke v. Nelson*, 762 F.2d 1318 (9th Cir. 1985)); *Rodriguez v. Cal. Highway Patrol*, 89 F.Supp.2d 1131, 1142 (N.D. Cal. 2000) (denying motion to dismiss claims for injunctive and declaratory relief, noting the "concerns raised by [d]efendants are better addressed after there has been at least some development of the factual record"))).

*Johnson v. Shasta Cty.*, 83 F. Supp. 3d 918, 933–34 (E.D. Cal. 2015). Plaintiffs have sufficiently alleged a pattern of unlawful conduct that, if allowed to continue, could lead to further constitutional violations. Such allegations are sufficient to withstand dismissal at this early stage of litigation. Therefore, defendants' motion to dismiss will be denied as to plaintiff's requests for declaratory and injunctive relief.

### F.    Recovery Under State Law

Both parties have agreed that plaintiffs' request for relief under California Code of Civil Procedure § 1021.5 and California Civil Code §§ 52 *et seq.*, 52.1 should be dismissed. (Doc. No. 11-1 at 12–13.)

Accordingly, plaintiffs' request for relief under state law will be dismissed.

/////

/////

**G.     Stay Pending Criminal Action**

Defendants seek a stay of this case until defendant Mullis' parallel criminal case is resolved.  (Doc. No. 11-1 at 13.)  According to news reports, the trial in that criminal proceeding has now concluded.  *See* https://www.fresnobee.com/news/local/article238570268.html. Accordingly, defendants' request for a stay has been rendered moot.

## CONCLUSION

For the reasons discussed above:

1.     Defendants' motion to dismiss (Doc. No. 11) is granted in part and denied in part;

    a.     Plaintiff's second cause of action asserting *Monell* liability is dismissed with leave to amend to the extent the claim is predicated upon an alleged absence of policy for approving backup firearms and holsters, failure to train, and ratification of unconstitutional conduct;

    b.     Plaintiffs' claim for relief under state law is dismissed;

2.     Defendants' motion to dismiss (Doc. No. 11) is denied in all other respects;

3.     Any amended complaint plaintiff may elect to file shall be filed within twenty-one (21) days from the date of service of this order; and

4.     Defendants' request for a stay of this action is denied as moot.

IT IS SO ORDERED.

Dated:  __**December 30, 2019**__          _____
                                           UNITED STATES DISTRICT JUDGE